**IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

**January 2017 Term**

_____

No. 16-0429

_____

**FILED**

**May 31, 2017**

released at 3:00 p.m.
RORY L. PERRY, II CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**GASTAR EXPLORATION, INC.,**
**Defendant Below Petitioner**

v.

**JOYCE CONTRAGUERRO,** *et al.*,
**Plaintiffs Below, Respondents**

_____

Appeal from the Circuit Court of Marshall County
The Honorable Jeffrey D. Cramer, Judge
Civil Action No. 14-C-89

_____

**REVERSED**
_____

**Submitted: May 23, 2017**
**Filed: May 31, 2017**

William M. Herlihy, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Matthew P. Heiskell, Esq.
Spilman Thomas & Battle, PLLC
Morgantown, West Virginia
Counsel for Gastar Exploration, Inc.

Jeremy M. McGraw, Esq.
James G. Bordas, Jr., Esq.
James G. Bordas, III, Esq.
James B. Stoneking, Esq.
Bordas & Bordas, PLLC
Wheeling, West Virginia
Counsel for Joyce Contraguerro, *et al.*

Mychal S. Schulz, Esq.
Matthew Casto, Esq.
Babst Calland Clements & Zomnir, P.C.
Charleston, West Virginia
Counsel for PPG Industries, Inc.

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
W. Henry Lawrence, Esq.
Allison J. Farrell, Esq.
Lauren A. Williams, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Counsel for *Amicus Curiae*
West Virginia Oil and
Natural Gas Association

George A. Patterson, III, Esq.
John W. Woods, III, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for *Amicus Curiae*
Independent Oil and Gas Association
of West Virginia, Inc.

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**SYLLABUS BY THE COURT**

1.  The pooling of nonparticipating royalty interests with the interests of other individuals or entities for the horizontal drilling and production of oil and gas from the Marcellus Shale Formation does not create a joint or undivided property interest in the oil and gas underlying the tract pooled. The cross-conveyance theory resulting in such a joint or undivided property interest is rejected. Rather, pooling results in a consolidation of contractual and financial interests regarding the drilling and production of oil and gas from the combined parcels of land.

2. Where a lessee designates tracts of land for pooling regarding horizontal drilling and production of oil and gas from the Marcellus Shale Formation, which includes nonparticipating royalty interests, consent or ratification by the holders of the nonparticipating royalty interests to the pooling is not required, where the holders of the nonparticipating royalty interests have conveyed the oil and gas in place and the executive leasing rights thereto to the lessor.

**Justice Ketchum**:

This appeal concerns a voluntary pooling and unitization lease provision regarding horizontal drilling and production of oil and gas from the Marcellus Shale Formation. The lessor is PPG Industries, Inc., ("PPG") and the lessee is Gastar Exploration USA, Inc., aka Gastar Exploration, Inc., ("Gastar"). The lease covered 3,285.6874 acres in Marshall County, and 700 acres thereof were designated by the lessee, Gastar, as the Wayne/Lily Unit for purposes of pooling the oil and gas interests held by various individuals and entities.[1]

---

[1] Although related, pooling and unitization have different technical meanings in oil and gas operations. Generally speaking, pooling arises from the bringing together of tracts of land for oil and gas drilling based primarily upon the allowable spacing of wells. The focus of unitization, however, is more directly on the geologic nature of the underlying oil and gas reservoir and enhanced-recovery techniques. *See* James E. McDaniel, *Statutory Pooling and Unitization in West Virginia: The Case for Protecting Private Landowners*, 118 W.Va. L. Rev. 439, 455 (2015) (Although "pooling" and "unitization" are often used interchangeably, pooling occurs "when separately owned tracts of land are 'pooled' or joined together in order to comply with spacing requirements or to have sufficient acreage with which to obtain a well permit." By contrast, the goal of unitization "is to consolidate enough of the interests in a particular reservoir to allow production to be carried out in the most efficient manner[.]"). *See also* Patrick H. Martin and Bruce M. Kramer, *Williams & Myers, Oil and Gas Law*, § 901 (LexisNexis Matthew Bender 2016) ("'[P]ooling' means the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules whereas 'unitization,' or, as it is sometimes described, 'unit operation,' means the joint operation of all or some part of a producing reservoir.").

In the current matter, the parties have used the terms "pooling" and "unitization" interchangeably. In this Opinion, we will refer to both terms simply as "pooling."

PPG and Gastar, defendants in the action below, challenge the April 1, 2016, order of the Circuit Court of Marshall County which granted partial summary judgment in favor of the plaintiffs, Joyce Contraguerro, *et al.*[2]  Although not parties to the PPG-Gastar lease, the plaintiffs ("NPRI holders") collectively hold a one-fourth nonparticipating royalty interest in the oil and gas underlying a 105.9 acre parcel included within the 700 acre Wayne/Lily Unit.  The NPRI holders do not own any interest in the surface of the 105.9 acre parcel, nor do they live on the property.

Generally, a nonparticipating royalty interest ("NPRI") describes a right to share in royalties from oil and gas drilling and production operations where the holder thereof has conveyed away all other interests in the oil and gas he or she may have had, including any possessory interest and the right to lease the minerals.  *See* Benjamin Holliday, *New Oil and Old Laws: Problems in Allocation of Production to Owners of Non-Participating Royalty Interests in the Era of Horizontal Drilling*, 44 Saint Mary's L. J. 771, 799 (2013) ("An NPRI is a nonpossessory interest, which means that the NPRI owner does not own the minerals in place but instead holds only a presently vested right to a stated fraction of production from any and all minerals produced.").

---

[2] The plaintiffs are Joyce Contraguerro, Edward Minor, Rose Hill, Janice Taylor, Danial Darrah, Dave Darrah, Carmalou Darrah, Kim Blacke, Joseph Darrah, Robbie Darrah, Kellie Darrah Haker, Theodore Minor, Harley Darrah, Orion Darrah, Jr., Claray Yoho, Lona Minor, Karen Walenciez, Johnathon Minor, Joshua Minor, and Tiffany Minor.

In *Davis v. Hardman*, 148 W.Va. 82, 133 S.E.2d 77 (1963), the terms "nonparticipating royalty interest" and "interest in oil and gas in place" were compared:

> The distinguishing characteristics of a non-participating royalty interest are: (1) Such share of production is not chargeable with any of the costs of discovery and production; (2) the owner has no right to do any act or thing to discover and produce the oil and gas; (3) the owner has no right to grant leases; and (4) the owner has no right to receive bonuses or delay rentals. Conversely, the distinguishing characteristics of an interest in minerals in place are: (1) Such interest is not free of costs of discovery and production; (2) the owner has the right to do any and all acts necessary to discover and produce oil and gas; (3) the owner has the right to grant leases, and (4) the owner has the right to receive bonuses and delay rentals.

(citation omitted) 148 W.Va. at 90, 133 S.E.2d at 81-82.

PPG and Gastar challenge the circuit court's entry of partial summary judgment in favor of the NPRI holders. The circuit court ruled that the pooling provision in the PPG-Gastar lease and the designated Wayne/Lily Unit are void until such time as pooling is consented to and ratified by the NPRI holders.

This Court is of the opinion, however, that the circuit court committed error in ruling that the validity of the pooling provision and the Wayne/Lily Unit was dependent upon the consent and ratification of the NPRI holders. Consequently, we reverse the April 1, 2016,

3

order and enter judgment in favor of PPG and Gastar.[3]

# I. Factual Background

## A. The Nonparticipating Royalty Interests

By deed made November 6, 1933, Mabell Sims Theiss and her sister, Ada Sims Parsons, acquired a one-half interest in the oil and gas in place underlying a 105.9 acre parcel in Franklin District, Marshall County. Thereafter, by deed made October 2, 1946, Mabell Sims Theiss and Ada Sims Parsons conveyed to John Wenzel the right "to lease said land for oil and gas purposes and receive any and all delay rentals that may be received under and by virtue of any lease executed by him, his heirs or assigns, covering said land." As a result, Mabell Sims Theiss and Ada Sims Parsons retained a one-half nonparticipating royalty interest in the 105.9 acres, without leasing rights which they had conveyed to John Wenzel. Wenzel had no right to receive royalties. His leasing rights were later acquired by PPG.

The current NPRI holders trace their royalty interest in the 105.9 acre parcel back to the one-fourth nonparticipating royalty interest of Mabell Sims Theiss. Mabell Sims Theiss died intestate, and her property passed to Eva Adele Minor, her sole heir. Eva Adele Minor

---

[3] By separate orders entered on August 10, 2016, this Court permitted *amicus curiae* briefs to be filed by the West Virginia Oil and Natural Gas Association and the Independent Oil and Gas Association of West Virginia, Inc. We acknowledge and appreciate the contribution of those organizations.

also died intestate, and her one-fourth nonparticipating royalty interest in the 105.9 acres passed to her heirs, the NPRI holders. The NPRI holders derived no royalty interest from Ada Sims Parsons.

### B. The Oil and Gas Lease and Operations Agreement

PPG's leasing rights, derived from the 1946 deed to John Wenzel, were described by the circuit court as follows: "PPG acquired the surface acreage associated with the 105.9 acre mineral estate and holds an 'executive right' to lease certain mineral interests underlying that tract of land. Defendant PPG does not own any royalty interest in the 105.9 acre mineral estate."[4]

On February 25, 2011, PPG, as lessor, entered into an Oil and Gas Lease and Operations Agreement (the "lease") with Gastar, the lessee.[5] PPG and Gastar are the only parties to the lease, and the lease covers 3,285.6874 acres, including the 105.9 acre parcel from which the interest of the NPRI holders arises. The granting clause, set forth in section 2 of the lease, provides in part:

---

[4] *See Black's Law Dictionary* 691 (10th ed. 2014) defining "executive right" as the "exclusive right to lease specified land or mineral rights. The executive right is one of the incidents of the mineral interest."

[5] Although the lease was not recorded, a memorandum thereof was recorded in the Office of the Clerk of the County Commission of Marshall County pursuant to *W.Va. Code*, 40-1-8 [1993].

5

PPG, for valuable consideration, including the payment of the agreed lease bonus, and subject to the provisions of this Lease, hereby grants, leases and lets the Leased Premises exclusively to Lessee [Gastar], without warranties or covenants of title of any nature and without any other warranties or representations, for the sole purpose of exploring for Oil and Gas in the Marcellus Shale Formation by geological, geophysical, seismic, and other methods, and of drilling, producing and operating Gas Wells or Oil Wells for recovering, removing and marketing Oil, Gas, and all associated Hydrocarbons from the Marcellus Shale Formation and all products produced therewith or which may be derived therefrom[.]

Gastar was required under the lease to make bona fide efforts to develop the leased premises in a prudent and workmanlike manner and at locations "likely to be capable of producing Hydrocarbons in Paying Quantities." In Section 9 of the lease, PPG granted Gastar the right "to pool or unitize parts of the Leased Premises with other lands or leases, whether owned by Lessee or by others at a time before or after drilling to create Pooled Horizontal Well Tracts." Furthermore, Section 9 provided regarding royalties: "Royalty on production of Hydrocarbons from a Pooled Horizontal Well Tract shall be reduced to the proportion that the amount of the Leased Premises acreage placed within the Pooled Horizontal Well Tract bears to the total acreage in the Pooled Horizontal Well Tract."

**C. The Wayne/Lily Unit and Requested Ratification**

On March 7, 2012, Gastar recorded a designation of pooled unit in the Office of the

6

Clerk of the County Commission of Marshall County.[6]  The designation, known as the Wayne/Lily Unit, provided that 700 acres of the leased premises in Franklin District, including the subject 105.9 acres, would be pooled to facilitate the exploration, development, production and marketing of oil and gas.  The designation addressed royalties as follows: "Each royalty and overriding royalty owner shall be compensated based on their pro rata share of ownership in each tract within the Unit and in the proportion of their tract acreage contribution to the total amount of acreage included in the Unit."

The Wayne/Lily Unit contains eight oil and gas wells drilled by Gastar.  The circuit court determined that five of the eight wells in the Unit have horizontal well bores which penetrate the minerals underlying the 105.9 acre parcel.  Soon after placement of the wells, Gastar began production operations within the Unit. The circuit court found that the NPRI holders were not asked to consent to the pooling of their royalty interests prior to the time Gastar established the Wayne/Lily Unit or prior to the commencement of production operations within the Unit.

Thereafter, Gastar began contacting the NPRI holders individually, asking each NPRI holder to sign and return a ratification of the February 25, 2011, lease between PPG and

---

[6] An amended designation of pooled unit was recorded on November 7, 2012, but does not impact the issues before this Court.

7

Gastar. The ratification covered all terms of the lease, including the pooling provision.[7] The

NPRI holders state that they were unaware of their royalty interests before Gastar contacted

them. According to the NPRI holders, Gastar refused to provide them with the details of the

lease for their review. As a result, the NPRI holders did not sign the ratifications.[8] Their

royalty payments have been placed in escrow pending the outcome of this litigation.

## II. Procedural Background

On May 29, 2014, the NPRI holders instituted a declaratory judgment action in the

circuit court against PPG and Gastar. The NPRI holders sought a declaration of their rights

and status regarding the lease in relation to the subject 105.9 acre parcel and the royalties

---

[7] In answer to the NPRI holders' second set of interrogatories, Gastar stated that

ratification of the lease in question was sought in order to obtain from the
heirs of Mabell Sims and Eva Minor, an acknowledgment of the existence
of the Oil and Gas Lease, the confirmation of the extent of their interest in
the property subject to that Lease, and to inform them of the lease royalty
applicable to the Mabell Sims Theiss interest once its current owners are
established.

[8] The NPRI holders later alleged in the amended complaint that they were refused
"a full and complete copy" of the February 25, 2011, PPG-Gastar lease. In response,
Gastar asserted that, according to its terms, the lease was subject to a confidentiality
clause which prohibited Gastar from providing the entire text to the NPRI holders. Gastar
stated, however, that a relevant, redacted portion of the lease was provided to the NPRI
holders' counsel. Moreover, Gastar indicated that the confidentiality clause did not
include the lease memorandum which was recorded in the Office of the Clerk of the
County Commission of Marshall County. *See* n. 5, *supra*.

payable from production operations.[9] In a subsequent amended complaint, the NPRI holders

added the allegation that, to the extent PPG held an executive right to lease the 105.9 acres,

PPG should not have given Gastar the authority to pool the 105.9 acre parcel with other

properties without the NPRI holders' consent.

Asserting that their royalty interests have been diluted, the NPRI holders demanded

damages against PPG and Gastar and a declaration that the lease is invalid "to the extent that

it permits Defendant Gastar to pool and/or unitize interests owned by the [NPRI holders]

with interests owned by other individuals." As the action proceeded, the NPRI holders, PPG

and Gastar filed motions for summary judgment.

On April 1, 2016, the circuit court entered an order granting partial summary

judgment in favor of the NPRI holders. The circuit court ruled that the pooling provision in

the PPG-Gastar lease and the designated Wayne/Lily Unit were void, "until such time as the

[NPRI holders] consent to and authorize those operations." Relying on court decisions from

---

[9] Also named in the action as defendants were Axiall Corporation and the "unknown and unidentifiable" heirs of Ada Sims Parsons. The NPRI holders alleged that the Axiall Corporation obtained ownership of certain PPG facilities in Natrium, Marshall County, and may have acquired rights and interests under the PPG-Gastar lease. The Axiall Corporation, however, was later dismissed from the action. Ada Sims Parsons was a predecessor of the interests of John Wenzel and PPG. However, the circuit court found that the NPRI holders' interests were derived solely from Ms. Parsons' sister, Mabell Sims Theiss. Any potential claim Ms. Parsons' unknown heirs may have in the 105.9 acre parcel is not before this Court.

Texas, the circuit court concluded that the pooling of the Wayne/Lily Unit constituted a "cross-conveyance" of the royalty interests of the NPRI holders with the interests of others within the Unit. In Vol. 2, Bruce M. Kramer and Patrick H. Martin, *The Law of Pooling and Unitization*, § 19.02[1][a] (LexisNexis Matthew Bender 2016), the following definition of "cross-conveyance" is offered: "Under cross-conveyance theory, the lessors would each own an undivided interest in the others' interest, and each would thereby have conveyed to the others a similar interest in the premises originally owned."

Based on the Texas version of cross conveyancing, the circuit court concluded that the consent or ratification of the NPRI holders to the pooling was required.[10] The circuit

---

[10] In suggesting a cross-conveyance of interests had occurred, the circuit court relied on the language of the Supreme Court of Texas in *Minchen v. Fields*, 345 S.W.2d 282 (Tex. 1961):

> [W]here mere executive rights are conferred or reserved, there is no intention evidenced to vest authority to convey a royalty interest reserved or the royalty interest attributable to the minerals leased and to hold that such holder can unitize or pool the interest would allow him to convey such royalty interest because a unitization of the royalty and minerals under different tracts effects a cross-conveyance to the owners of minerals under the various tracts of royalty or minerals so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract.

(citation omitted) 345 S.W.2d at 285. *See Brown v. Getty Reserve Oil, Inc.*, 626 S.W.2d 810, 814 (Tex. App. 1981) (Pooling by the executive rights holder is not binding absent the NPRI holder's consent.). *See also Ragsdale v. Superior Oil Co.*, 237 N.E.2d 492 (Ill. 1968), where the Supreme Court of Illinois stated that unitization creates "a single ownership of the entire unit by the owners of the several tracts making up the unit, subject

court stated:

> In the present case, Defendants PPG and Gastar entered into an oil and gas lease agreement which permits Gastar to pool the covered mineral acreage into oil and gas production units and to measure and pay oil and gas production royalties from the entire unit proportionately to the owners of the mineral interests based upon the amount of the different acreages which make up the unit as a whole.
>
> Five oil and gas well drilling legs actually penetrate into the 105.9 acre tract of land which includes the [NPRI holders'] non-participating royalty interest. Properties included within the Wayne/Lily Unit include properties upon which there is no oil and gas well surface location and under which none of the 5 oil and gas horizontal drilling legs which penetrate the [NPRI holders'] interest are located. Those properties which are not touched by the drilling site and/or the drilling legs still share in the oil and gas production from those 5 wells. This is exactly the situation contemplated by the cases which have found that non-participating royalty interests may not be pooled without consent.

PPG and Gastar challenge the partial summary judgment granted in favor of the NPRI holders.[11]

---

to the terms of the oil and gas leases." 237 N.E.2d at 494.

[11] In addition to the consent and ratification issue, PPG challenges the denial of its own motion for summary judgment regarding PPG's negotiation of the overall terms of the PPG-Gastar lease. The NPRI holders challenged the reasonableness of PPG's entitlement under the lease to free gas, in-kind royalties and shut-in royalties. The NPRI holders asserted that such entitlements should be treated as "production," thereby generating additional royalties payable to the NPRI holders. In other words, the NPRI holders contend that had PPG negotiated the lease differently, the NPRI holders would have been entitled to higher royalty payments. *See Donahue v. Bills*, 172 W.Va. 354, 305 S.E.2d 311 (1983), wherein this Court noted that, even though the grantor in a deed of conveyance reserved an executive right to lease the underlying minerals, the grantor would nevertheless be held to "strict fiduciary standards" regarding such matters as rental payments and lease inducement payments. 172 W.Va. at 356, 305 S.E.2d at 313.

11

### III. Standard of Review

Pursuant to Rule 56 of the *West Virginia Rules of Civil Procedure*, a party seeking to recover upon a claim, or to obtain a declaratory judgment, may move for summary judgment "upon all or any part thereof." If partial summary judgment is granted, the standard of review on appeal to this Court is *de novo*. Syl. pt. 1, *W.Va. Dep't. of Transp. v. Robertson*, 217 W.Va. 497, 618 S.E.2d 506 (2005) ("Appellate review of a partial summary judgment order is the same as that of a summary judgment order, which is *de novo*."). *Accord* syl. pt. 1, *Hinerman v. Rodriguez*, 230 W.Va. 118, 736 S.E.2d 351 (2012). Syl. pt. 3, *Cox v. Amick*, 195 W.Va. 608, 466 S.E.2d 459 (1995) ("A circuit court's entry of a declaratory judgment is reviewed *de novo*."). *Accord* syl. pt. 1, *Randolph County Bd. of Educ. v. Adams*, 196 W.Va. 9, 467 S.E.2d 150 (1995).

---

However, the denial of PPG's motion for summary judgment concerning the negotiation of the lease and the entitlements mentioned is not properly before this Court. The April 1, 2016, order states that questions of fact are yet to be resolved concerning PPG's "negotiation and execution of the lease terms," and "proceeding shall continue as to those issues." *See* syl. *Wilfong v. Wilfong*, 156 W.Va. 754, 197 S.E.2d 96 (1973) ("The entry of an order denying a motion for summary judgment made at the close of the pleadings and before trial is merely interlocutory and not then appealable to this Court."); *Aetna Casualty and Sur. Co. v. Fed. Ins. Co. of N.Y.*, 148 W.Va. 160, 172, 133 S.E.2d 770, 778 (1963) ("The denial of a summary judgment is a finding that there is an issue of fact to be tried and is not a decision on the issue."). *See also In Re: Timber M.*, 231 W.Va. 44, 59, 743 S.E.2d 352, 367 (2013) ("Without factual or legal findings, this Court is greatly at sea without a chart or compass in making a determination as to whether the circuit court's decision was right of wrong." (citation omitted)). Here, further development of the record by the circuit court is necessary with respect to the negotiation and execution of the PPG-Gastar lease.

Moreover, although findings of fact are generally reviewed under a clearly erroneous standard, "ostensible findings of fact, which entail the application of law or constitute legal judgments which transcend ordinary factual determinations," are also reviewed *de novo*. Syl. pt. 1, in part, *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 470 S.E.2d 162 (1996).

## IV. Discussion

The issue in this appeal is whether the validity of the pooling provision in the PPG-Gastar lease and the designated Wayne/Lily Unit is dependent upon the consent and ratification of the NPRI holders. Relying on the theory of cross-conveyancing of interests expressed in Texas court decisions, the circuit court ruled that the consent and ratification of the NPRI holders are required.

A further clarification of the respective rights of the NPRI holders and PPG is necessary. The NPRI holders in this action do not own any interest in the surface of the 105.9 acre parcel, nor do they live on the property. Their collective one-fourth nonparticipating royalty interest in the oil and gas originated with the 1946 deed. Pursuant to the deed, all remaining interests in the 105.9 acre parcel were conveyed to PPG's predecessor, John Wenzel. It is undisputed that the deed is unambiguous. With regard to leasing rights, the 1946 deed expressly conveyed to Wenzel the right "to lease said land for oil and gas purposes and receive any and all delay rentals that may be received under and by

13

virtue of any lease executed by him, his heirs or assigns, covering said land." No reservation to the grantor was included in the deed concerning any right to discover or produce oil and gas, to grant leases, or to require consent in relation thereto.

Syllabus point 1 of *McDonough Co. v. E.I. DuPont DeNemours & Co., Inc.*, 167 W.Va. 611, 280 S.E.2d 246 (1981) holds: "Parties are bound by general and ordinary meanings of words used in deeds." *Accord* syl. pt. 1, *Meadows v. Belknap*, 199 W.Va. 243, 483 S.E.2d 826 (1997). *See W.Va. Dep't of Highways v. Farmer*, 159 W.Va. 823, 825, 226 S.E.2d 717, 719 (1976) ("It has long been held that where language in a deed is unambiguous there is no need for construction and it is the duty of the court to give to every word its usual meaning.").[12] Helpful in that regard is the syllabus in *Davis v. Hardman*, 148 W.Va. 82, 133 S.E.2d 77 (1963), which holds:

> Where deeds are made by which several undivided interests in a tract of land are conveyed, with the right in the several grantees, their heirs and assigns, to lease the land for oil and gas purposes and to receive the carrying rental, or the bonuses and carrying rentals, but subject to reservations in favor of the several grantors of the oil and gas royalty, when produced, such

---

[12] *W.Va. Code*, 36-1-11 [1923], states:

> When any real property is conveyed or devised to any person, and no words of limitation are used in the conveyance or devise, such conveyance or devise shall be construed to pass the fee simple, or the whole estate or interest, legal or equitable, which the testator or grantor had power to dispose of, in such real property, unless a contrary intention shall appear in the conveyance or will.

14

reservations do not constitute a reservation of the oil and gas in place; but, on the contrary, such deeds constitute a conveyance of the entire tract of land, including the oil and gas in place, but subject to mere royalty interests in the oil and gas when such oil and gas, or both, are produced.

Accordingly, the NPRI holders have a nonpossessory interest in the oil and gas underlying the 105.9 acre parcel. *See* Andrew S. Graham, Allison J. Farrell, Lauren A. Williams, Amber M. Moore, *One Stick in the Bundle: Characterizing Nonparticipating Royalty Interests Under West Virginia Law*, 117 W.Va. L. Rev. 519, 520 (2014) (NPRI holders have a "non-possessory real property interest."). *See also* 38 Am. Jur. 2d *Gas and Oil* § 196 (2010) ("A nonparticipating gas and oil royalty is a nonpossessory interest that does not entitle the owner to produce the gas and oil himself or herself, but does entitle the owner to a certain share of the production proceeds, free of the expenses of exploration and production."). Conversely, through the 1946 deed, PPG acquired an interest in the parcel's oil and gas in place, which included an executive right to discover and produce the oil and gas and an attendant right to lease the parcel.[13] PPG has also obtained title to the surface of the 105.9 acre parcel.

---

[13] *See Boggess v. Milam*, 127 W.Va. 654, 658, 34 S.E.2d 267, 269 (1945) (Oil and gas in place is real estate.). *See also* Andrew S. Graham, Allison J. Farrell, Lauren A. Williams, Amber M. Moore, *One Stick in the Bundle: Characterizing Nonparticipating Royalty Interests Under West Virginia Law*, 117 W.Va. L. Rev. 519, 521 (2014) ("West Virginia law is well-settled that an interest in the oil and gas in place is a real property interest[.]")

The Texas cases suggest that NPRI holder consent or ratification is warranted insofar as pooling creates an undivided ownership interests with other individuals and entities by cross-conveyancing across the entire tract.[14] The NPRI holders herein ask this Court to adopt the cross-conveyancing theory. However, that theory is but one side of a split of authority regarding the effect of pooling on such interests. As described in Benjamin Holliday, *New Oil and Old Laws: Problems in Allocation of Production to Owners of Non-Participating Royalty Interests in the Era of Horizontal Drilling*, 44 Saint Mary's L. J. 771 (2013), two competing theories have been applied: the cross-conveyance theory and the contract theory. The article explains:

> [T]he basis for the cross-conveyance theory is the premise that mineral interests involved in the pooled unit are actually conveyed to other owners within the pooled unit in proportion to the acreage allocated by each to the unit. On the other hand, the contract basis for pooling stipulates that property interests themselves are not conveyed; rather, this approach seeks to determine the contractual rights associated with royalty payments.

44 Saint Mary's L. J. at 796. Texas, Mississippi, Illinois and California have adopted the cross-conveyance theory, whereas Utah, Oklahoma and Kansas employ the contract theory. Id, n. 169. The article includes West Virginia as employing the contract theory. Under that

---

[14] The requirement of consent or ratification makes more sense where cross-conveyancing has created joint or undivided interests throughout the pooled tract. *See* Nancy Saint-Paul, Vol. 4, *Summers Oil and Gas* § 56:2 (3rd ed. 2009) (In a cross-conveyancing jurisdiction "pooling results in the mineral interest being converted into multiple fractional royalty ownerships in all the pooled tracts.")

16

theory, pooling results in a consolidation of contractual and financial interests regarding oil and gas production from the combined parcels of land. Joint or undivided ownership interests in oil and gas rights are not created.

In *Boggess v. Milam*, 127 W.Va. 654, 34 S.E.2d 267 (1945), the owner of an unleased one-tenth oil and gas interest in a 116 acre tract of land sought a share in the royalties from oil and gas production regarding an adjoining 53 acre tract. Although the owner had no interest of any kind in the 53 acre tract, the two tracts were under a unitization agreement. The owner had refused to sign both the lease of the 116 acre tract and the unitization agreement.

In *Boggess*, this Court rejected the owner's claim to an interest in production from the 53 acre tract. In so holding, this Court found without merit the owner's assertion that the unitization agreement resulted in a merger of the titles of the two tracts. The language in *Boggess* makes clear:

> We are not of the opinion that in the instant case the land was merged: there was a merger of contractual obligations, the lessors agreeing to treat the two leases as covering one boundary so far as the lessee's obligation to develop was concerned, and the lessee agreeing to divide the payment of royalty on the basis of the fractional acreage interest in the oil and gas.  *  *  *   [T]he so-called unitization agreement does not effect a merger of title.

17

127 W.Va. at 661, 34 S.E.2d at 270.

In a subsequent case, *Donahue v. Bills*, 172 W.Va. 354, 305 S.E.2d 311 (1983), George and Jeanne Bills conveyed a tract in excess of 300 acres to Ernie and Laura Donahue. The Bills reserved one-half of the underlying minerals and the right to lease for drilling purposes. Soon after, the Bills entered into a lease resulting in the drilling of an oil and gas well on the tract. The Donahues filed an action to enjoin the drilling operations and the leasing of their property without their consent. The circuit court granted summary judgment in favor of the Bills, the oil company and the driller on the basis of the language of the reservation clause.

Affirming the summary judgment in *Donahue v. Bills*, this Court determined that the reservation clause unambigously provided the Bills with "an agency coupled with an interest" known as an executive right. Thus, confirming that the reservation clause gave the Bills the right to lease the minerals, this Court stated:

> Often complicated business transactions require the acquiescence of numerous persons making negotiations unwieldy and uncertain. The agency coupled with an interest has numerous uses, but one of those uses is to guarantee in advance, by an appropriate agreement, that parties who must acquiesce to the consummation of a business deal will do so at the appropriate time and in the appropriate form. In the case before us, it was obviously contemplated by the parties when they entered into the deeds in question that the Bills would be allowed to conduct negotiations on behalf of the Donahues in order to facilitate a harvesting of the mineral interest.

18

> Furthermore, there is nothing unreasonable about such an arrangement: it is common experience that when oil and gas interests are owned by numerous persons, negotiating a lease acceptable to all owners can be a nightmare for everyone concerned. The protection that the Donahues receive is that any lease entered into under unfavorable terms by the Bills will deny the Bills fully as much as the Donahues a fair return to their jointly owned property.

172 W.Va. at 355-56, 305 S.E.2d at 312.

In the present case, the NPRI holders' interest in the 105.9 acre parcel was determined by the 1946 deed. All remaining interests in the parcel, including the executive right to lease, were conveyed to the grantee, John Wenzel. The 1946 deed provided no limit affecting the pooling provision in the subsequent lease between PPG and Gastar regarding drilling and production from the Marcellus Shale Formation. Accordingly, pursuant to contract law, the PPG-Gastar lease and the Wayne/Lily Unit simply resulted in a consolidation of leasehold interests, including the interests in the 105.9 acre parcel. There was no merger of titles, and the NPRI holders did not acquire an undivided property interest in the Unit's 700 acres.

The adoption of a cross-conveyance theory of pooling would inject uncertainty in this State's oil and gas jurisprudence. An NPRI holder, by withholding consent, could unilaterally void an entire pooling agreement involving thousands of acres and the bargained-for rights of dozens of other interest holders. In the current matter, by ruling that the pooling

19

provision in the PPG-Gastar lease and the Wayne/Lily Unit are void, the circuit court effectively reconveyed executive right authority to the NPRI holders.[15]

This Court's decisions in *Davis v. Hardman*, *Boggess v. Milam*, and *Donahue v. Bills* have provided stability in this complex area of the law. The case before us is within the parameters of voluntary pooling regarding horizontal drilling and production from the Marcellus Shale Formation.

Consequently, we hold that the pooling of nonparticipating royalty interests with the interests of other individuals or entities for the horizontal drilling and production of oil and gas from the Marcellus Shale Formation does not create a joint or undivided property interest in the oil and gas underlying the tract pooled. The cross-conveyance theory resulting in such a joint or undivided property interest is rejected. Rather, pooling results in a consolidation of contractual and financial interests regarding the drilling and production of oil and gas from the combined parcels of land. Moreover, we hold that where a lessee designates tracts of land for pooling regarding horizontal drilling and production of oil and gas from the

---

[15] The cross-conveyance theory has other disadvantages. For example, if one of the royalty owners were to become involved in litigation concerning his or her specific interest, all other royalty owners would be affected because each would share ownership interests throughout the pooled unit. Moreover, the cross-conveyance theory could result in problems such as the validity of earlier pooling agreements, increased royalty litigation, and complications in the lease acquisition process.

20

Marcellus Shale Formation, which includes nonparticipating royalty interests, consent or ratification by the holders of the nonparticipating royalty interests to the pooling is not required, where the holders of the nonparticipating royalty interests have conveyed the oil and gas in place and the executive leasing rights thereto to the lessor.

Accordingly, we reverse the ruling of the circuit court that the validity of the pooling provision in the PPG-Gastar lease and the designated Wayne/Lily Unit is dependent upon the consent and ratification of the NPRI holders.[16]

## V. Conclusion

This Court finds reversible error in the partial summary judgment which invalidated

---

[16] The amici curiae maintain that horizontal or directional drilling, pooling and unitization are particularly suitable to development of the Marcellus Shale Formation in West Virginia. In that regard, Gastar states that it determined that it was necessary and advisable to pool the 105.9 acres with other parcels to prevent waste, to facilitate the orderly development of the minerals, to preserve correlative rights and to effect equitable participation within the pooled unit to be formed. *See* Nancy Saint-Paul, Vol. 4, *Summers Oil and Gas* § 56:2 (3rd ed. 2009) ('[T]here are cases holding that the power to lease does comprehend the power to pool, and this view better accords with the realities of the oil and gas industry where pooling powers are always desirable, and sometimes essential, if a property is to be developed.").

*See also W.Va. Code*, 22-6A-2(a)(8) [2011], of the *West Virginia Horizontal Well Act*, wherein the Legislature declared as a matter of public policy: "Allowing the responsible development of our state's natural gas resources will enhance the economy of our state and the quality of life for our citizens while assuring the long term protection of the environment."

the pooling provision in the PPG-Gastar lease and the Wayne/Lily Unit, and we enter judgment for PPG and Gastar.  The April 1, 2016, order is, therefore, reversed.

Reversed.